**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cogent Healthcare of Arizona PC, et al., | No. CV-23-02119-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Blue Cross and Blue Shield of Arizona Incorporated, | |
| Defendant. | |

At issue is Defendant Blue Cross and Blue Shield of Arizona Inc.'s ("BCBSAZ") motion to dismiss Plaintiffs Cogent Healthcare of Arizona, P.C., Sound Physician Intensivists of Arizona, Inc., Sound Physicians Emergency Medicine of Arizona, Inc., and Hospitalist Medicine Physicians of Arizona – Nogales, Inc.'s (collectively, "Plaintiffs") complaint (Doc. 21), which is fully briefed (Docs. 22–23).[1] For reasons stated below, the Court dismisses Plaintiffs' sole federal claim and orders the parties to show cause why the Court should not decline supplemental jurisdiction over the state law claims.

## I. Background[2]

Congress enacted the No Surprises Act ("NSA"), effective January 1, 2022, to protect patients from surprise medical bills from out-of-network ("OON") medical providers. (Doc. 1 ¶ 4.) An OON medical provider is one that does not have a negotiated

---

[1] BCBSAZ's request for oral argument is denied because the issues are well-briefed and oral argument will not assist the Court.

[2] The following summary is derived from the complaint (Doc. 1) and presumed true for purposes of this order. *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

contract with a given payor. (¶ 5.) "Surprise medical bills arise when a consumer covered by a health plan is unexpectedly treated by an [OON] provider and is required to pay the difference between what the plan pays and the provider's charge." H.R. Rep. No. 116-615, pt. I, at 47 (Dec. 2, 2020). To protect patients from these unforeseen medical costs, the NSA creates an independent dispute resolution ("IDR") process for OON providers. (Doc. 1 ¶ 5.) This IDR process works by facilitating negotiation between OON providers and payors over reimbursement for services and, if necessary, by channeling those disputes into binding arbitration. The patient is removed from the dispute and cannot be billed separately. H.R. Rep. No. 116-615, pt. I, at 47, 57–58; *see* 42 U.S.C. § 300gg-111. The IDR process, however, is not available if there is a direct or indirect contractual relationship between the payor and the provider (i.e., to in-network ("INN") providers). *See* 42 U.S.C. § 300gg-111(a)(3)(F); 45 C.F.R. § 149.30.

Plaintiffs are physician groups that employ over 300 Arizona-licensed physicians and provide hospital-based services in Emergency Medicine, Critical Care, Hospital Medicine, and Anesthesiology. (Doc. 1 ¶ 1.) BCBSAZ is one of Arizona's dominant healthcare payors. (¶¶ 2, 115.) Until December 2021, Plaintiffs were INN with BCBSAZ for Hospital Medicine and Critical Care; Plaintiffs' Emergency Medicine and Anesthesia practices have always been OON with BCBSAZ. (¶¶ 15–16.) Plaintiffs terminated their INN contracts with BCBSAZ on December 31, 2021, after unsuccessfully attempting to negotiate higher reimbursement rates. (¶¶ 17–18.) As a result, beginning in 2022, Plaintiffs became OON with BCBSAZ for all services. (¶ 19.) Of the more than 300 physicians that Plaintiffs employ, however, approximately 140 maintain their own individual provider contracts ("IPCs") with BCBSAZ, meaning these physicians individually are INN providers but the practice groups that employee them are not. (¶¶ 24, 26.) This arrangement is typical, both so that such physicians are prepared in the event they decide to practice medicine independently, or if they otherwise happen to provide services outside their employment contracts with Plaintiffs. (¶¶ 25, 85.)

1      Although Plaintiffs are OON with BCBSAZ, when the employee physicians who

2   provide the medical services to a given patient have IPCs with BCBSAZ, then BCBSAZ

3   will treat those claims as having been submitted by an INN provider and reimburse

4   Plaintiffs in accordance with those IPCs. (¶¶ 24, 28.) The reimbursement rates in these

5   IPCs are low because these contracts often date back decades to when these physicians first

6   became licensed in Arizona, and the rates typically are not adjusted because most

7   physicians work on behalf of larger practice groups that have their own group contracts. (¶

8   26.) But, because BCBSAZ treats these services as having been provided directly or

9   indirectly by an INN provider, Plaintiffs are unable to avail themselves of the NSA's IDR

10  process and, instead, are stuck with the low IPC reimbursement with no meaningful way

11  to dispute it. (¶¶ 28, 30, 32–33.)

12      Plaintiffs are routinely successful in disputing through the IDR process healthcare

13  claims reimbursed by other, smaller healthcare payors in Arizona, typically resulting in

14  reimbursements 400% higher than what was originally paid. (¶ 13.) Plaintiffs would like

15  to avail themselves of this IDR process for all disputed claims with BCBSAZ. To that end,

16  they attempted to coordinate the termination of the IPCs for all their employee physicians.

17  (¶¶ 90–91.) BCBSAZ, however, notified Plaintiffs that if an individual physician

18  terminates his or her respective IPC with BCBSAZ, then BCBSAZ would terminate the

19  group agreements for every affiliated provider that also employs the individual physician.

20  (¶¶ 91–92.) Consequently, roughly 140 of Plaintiffs' employee physicians have elected to

21  keep their IPCs. (*See* ¶ 26.) Plaintiffs claim BCBSAZ is wielding its outsized market power

22  to freeze Plaintiffs out of the NSA's IDR process for certain of their submitted healthcare

23  claims, thereby depressing the rates for Plaintiffs' services below what BCBSAZ pays to

24  other OON providers in the same geographic area for the same services. (¶¶ 12, 23.)

25      Plaintiffs all are Arizona corporations. (¶¶ 44–48.) BCBSAZ likewise is domiciled

26  in Arizona. (¶¶ 49, 54.) Plaintiffs filed this action in federal court, asserting federal question

27  jurisdiction under 28 U.S.C. §§ 1331 and 1337 because their complaint alleges that

28  BCBSAZ has violated § 2 of the Sherman Act by attempting to acquire, possess, and wield

1  monopoly power in the Arizona market for private health insurance. (¶¶ 56, 136–140.)

2  Plaintiffs also bring three claims arising under Arizona state law—tortious interference

3  with a contractual or business expectancy (¶¶ 142–146), unfair business practices in

4  violation of A.R.S. § 44-1522 (¶¶ 148–155), and unjust enrichment (¶¶ 157–160)—over

5  which Plaintiffs ask the Court to accept supplemental jurisdiction under 28 U.S.C. § 1367

6  (¶ 56). Plaintiffs demand injunctive and declaratory relief, as well as damages, costs, and

7  attorney fees.[3] (¶¶ A–H.) BCBSAZ moves to dismiss all claims under Federal Rule of Civil

8  Procedure 12(b)(6). (Doc. 21.)

9  **II.      Legal Standard**

10  Rule 12(b)(6) allows a defendant to seek dismissal of a complaint that is not based

11  on a cognizable legal theory or that lacks sufficient facts to state a plausible claim under

12  an otherwise cognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

13  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When analyzing a

14  complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual

15  allegations are taken as true and construed in the light most favorable to the nonmoving

16  party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched

17  as factual allegations are not entitled to the assumption of truth and therefore are

18  insufficient to defeat a motion to dismiss for failure to state a claim. *In re Cutera Sec. Litig.*,

19  610 F.3d 1103, 1108 (9th Cir. 2010). Nor is the Court required to accept as true "allegations

20  that contradict matters properly subject to judicial notice," or that merely are "unwarranted

21

22

23  [3] Plaintiffs plead their demands for injunctive and declaratory relief as separate causes of action—counts one and two of the complaint. (Doc. 1 ¶¶ 121–132.) But, as BCBSAZ correctly notes, these are *remedies* for an underlying cause of action. (Doc. 21

24  at 10 n.2 (citing *Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 770 (D. Ariz. 2012) and *Adelman v. Rheem Mfg. Co.*, 2:15-cv-00190 JWS, 2015 WL 4874412, at *8 (D.

25  Ariz. Aug. 14, 2015)).) Plaintiffs acknowledge in their response that these are remedies rather than independent claims; they simply believe they have sufficiently pled underlying

26  claims that justify the remedies. (Doc. 22 at 17–18.) The Court therefore excludes counts one and two of the complaint from its summary of Plaintiffs' causes of action. The parties

27  purport to have conferred on the issues raised in BCBSAZ's motion to dismiss prior to its filing and were unable to agree that the complaint was curable *in any part* by a permissible

28  amendment. (Doc. 21 at 21.) The mislabeling of remedies as causes of action could have been cleaned up via a permissible amendment, obviating the need for briefing on this issue.

1   deductions of fact, or unreasonable inferences.*" Sprewell v. Golden State Warriors*, 266

2   F.3d 979, 988 (9th Cir. 2001).

3       **III.**    **Analysis**

4           **A. Plaintiffs have not pled a plausible antitrust claim.**

5           Plaintiffs' sole federal claim is an attempted monopolization claim under § 2 of the

6   Sherman Act. 15 U.S.C. § 2. "[T]o demonstrate attempted monopolization a plaintiff must

7   prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2)

8   a specific intent to monopolize and (3) a dangerous probability of achieving monopoly

9   power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The possession

10  of monopoly power alone is not an antitrust violation. It must be accompanied by an

11  element of anticompetitive conduct." *Aerotec Intern., Inc. v. Honeywell Intern., Inc.*, 4

12  F.Supp.3d 1123, 1136–37 (D. Ariz. 2014).

13          Relatedly, "[o]nly those who meet the requirements for 'antitrust standing' may

14  pursue a claim under the [Sherman] Act; and to acquire 'antitrust standing,' a plaintiff must

15  adequately allege and eventually prove 'antitrust injury.'" *Glen Holly Entm't, Inc. v.*

16  *Tektronix Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003); *see also Somers v. Apple, Inc.*, 729

17  F.3d 953, 963 (9th Cir. 2013). "Antitrust injury means injury of the type the antitrust laws

18  were intended to prevent and that flows from that which makes defendants' acts unlawful."

19  *Somers*, 729 F.3d at 963 (internal quotations and citation omitted). In the Ninth Circuit,

20  antitrust injury is "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows

21  from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws

22  were intended to prevent." *Id.* (internal quotations and citations omitted). Additionally,

23  "the injured party [must] be a participant in the same market as the alleged malefactors,"

24  which ordinarily means "the party alleging the injury must be either a consumer of the

25  alleged violators goods or services or a competitor of the alleged violator in the restrained

26  market," *Id.* (internal quotations and citations omitted), though there could be "situations

27  in which other market participants can suffer antitrust injury," *Am. Ad Mgmt, Inc. v. Gen.*

28  *Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999).

1        BCBSAZ argues that Plaintiffs have not pled an antitrust injury or that BCBSAZ

2 engaged in anticompetitive conduct necessary to elevate the mere possession of

3 monopoly—or, here, monopsony[4]—power to a plausible antitrust violation. The Court

4 agrees.

5        The crux of Plaintiffs' Sherman Act claim is that BCBSAZ is wielding its

6 monopsony power to reimburse Plaintiffs at rates they believe are unfair. (*See* Doc. 22 at

7 5:1–7.) Plaintiffs allege that BCBSAZ has done so by unlawfully refusing to deal with

8 Plaintiffs in the negotiation of new group INN contracts and by improperly treating OON

9 claims submitted by Plaintiffs as INN claims whenever the individual physicians providing

10 the relevant services have IPCs, resulting in low reimbursement rates that Plaintiffs are

11 unable to challenge through the NSA's IDR procedures.

12        "A firm that has substantial power on the buy side of the market (i.e., monopsony

13 power) is generally free to bargain aggressively when negotiating the prices it will pay for

14 goods and services." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103

15 (3d Cir. 2010). "Antitrust law rarely stops the buyer of a service from trying to determine

16 the price or characteristics of the product that will be sold." *Kartell v. Blue Shield of*

17 *Massachusetts, Inc.*, 749 F.2d 922, 925 (1st Cir. 1984); *see also Westchester Radiological*

18 *Associates P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 717 (S.D.N.Y.

19 1989) ("The law does not prevent a buyer with market power from negotiating a good

20 price, or from specifying what it will buy."). "A legitimate buyer is entitled to use its market

21 power to keep prices down," *Kartell*, 749 F.2d at 929, because "low prices benefit

22 consumers regardless of how those prices are set, and so long as they are above predatory

23 levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury,"

24 *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). *See also Kartell*, 749

25 F.2d at 931 ("[T]he Congress that enacted the Sherman Act saw it as a way of protecting

26 consumers against prices that were too high, not too low."); *Malheur Forest Fairness*

27        [4] "Monopsony power is market power on the buy side of the market. As such, a
28 monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007).

*Coalition v. Iron Triangle, LLC*, 699 F.Supp.3d 1086, 1116 (D. Or. 2023) ("Seeking the lowest possible price . . . is pro-competitive behavior, which in the end, should lower the costs . . . for consumers."); *Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*, 2:20-CV-12916, 2021 WL 4169711, at *13 (E.D. Mich. Sep. 14, 2021) ("At bottom, antitrust law protects consumers from anticompetitive conduct that can lead to higher prices."). The fact that a seller might lose profits because of a dominant buyer's insistence on paying low prices "does not inevitably mean that competition as a whole is lessened," *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989), and "the central purpose of the antitrust laws . . .is to preserve competition," *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000), not to protect individual competitors, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Antitrust law simply does not protect sellers from "conduct that [is] beneficial or neutral to competition." *Pool Water Prods. v. Olin Corp.*, 258 P.3d 1024, 1034 (9th Cir. 2011). "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

Although "[i]njury to competition can occur by monopsony just as it may result from monopoly," *In re NCAA I-A Walk-On Football Players Litigation*, 398 F.Supp.2d 1144, 1151 (W.D. Wash. 2005), the circumstances under which this plausibly can occur are far narrower. Courts typically are concerned that a monopsonist will use its dominant buying power to pay too much for an input—i.e., predatory bidding—thereby driving its competitors out of business because they cannot afford to match the price for the input. *See Weyerhauser*, 549 U.S. at 318–19. Antitrust liability can also arise from a horizontal conspiracy whereby a defendant agrees with others to fix prices "caus[ing] buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint." *Knevelbaard*, 232 F.3d at 988; *see also West Penn*, 627 F.3d at 103 ("[W]hen a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny[.]"). "Horizontal price fixing is a per se violation

1    regardless of whether the prices set are minimum or maximum." *Knevelbaard*, 232 F.3d at

2    988. But absent these anticompetitive purposes and effects, buyers (even dominant ones)

3    are free to pursue (even aggressively) low prices because low prices are generally pro-

4    consumer and pro-competition. These general principles apply no differently in the

5    healthcare market; "a health plan lowering reimbursement rates paid to a physician practice

6    is generally insufficient to establish antitrust injury." *Long Island Anesthesiologists PLLC*

7    *v. United Healthcare Ins. Co. of New York Inc.*, 22-CV-04040 (HG), 2023 WL 8096909,

8    at *6 (E.D.N.Y. Nov. 21, 2023).

9         Plaintiffs do not allege that BCBSAZ conspired with other health insurers to keep

10   prices for Plaintiffs services artificially low. Nor do they allege that BCBSAZ has engaged

11   in predatory bidding. "In a typical predatory-pricing scheme, the predator reduces the sale

12   price of its product (its output) to below cost, hoping to drive competitors out of business.

13   Then, with competition vanquished, the predator raises output prices to a supracompetitive

14   level." *Weyerhauser*, 549 U.S. at 318. "For the scheme to make economic sense, the losses

15   suffered from pricing goods below cost must be recouped (with interest) during the

16   supracompetitive-pricing stage of the scheme." *Id.* Nothing of the sort is alleged here.

17        Nor have Plaintiffs pled a plausibly illegal refusal to deal. Plaintiffs allege that, by

18   December 2021, it became clear that their contracted rates for hospital medicine and critical

19   services had fallen below then-current market rates, so they notified BCBSAZ that they

20   intended to terminate the contract unless the parties could negotiate new (higher) rates.

21   (Doc. ¶ 17.) Plaintiffs claim BCBSAZ did not respond with any offers that Plaintiffs

22   deemed reasonable, resulting in the termination of the contract, at which point Plaintiffs

23   became OON for all services with BCBSAZ. (¶¶ 18–19.) Yet, by reimbursing some of the

24   claims submitted by Plaintiffs using the rates in the IPCs between BCBSAZ and certain of

25   Plaintiffs' employee physicians, BCBSAZ has prevented Plaintiffs from securing higher

26   OON reimbursements for those claims through the NSA's IDR process and continues to

27   reimburse Plaintiffs at below-market rates. (¶¶ 22–30.)

28

1    "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right

2    of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his

3    own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc.*

4    *v. Law Offices of Curtis V. Trinko*, *LLP*, 540 U.S. 398, 408 (2004) (quoting *United States*

5    *v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Steward Health Care Sys., LLC v.*

6    *Blue Cross & Blue Shield of Rhode Island*, 997 F.Supp.2d 142, 152 (D.R.I. 2014) ("In the

7    absence of any purpose to create or maintain a monopoly, the Sherman Act does not restrict

8    the long-recognized right of a trader or manufacturer engaged in an entirely private

9    business freely to exercise his own independent discretion as to the parties with whom he

10   will deal."). A refusal to deal can, under some circumstances, run afoul of the antitrust

11   laws, but only under limited circumstances where the refusal to deal bears hallmarks of an

12   attempt to undermine competition. *See Trinko*, 540 U.S. at 408; *New Mexico Oncology v.*

13   *Presbyterian Healthcare Services*, 418 F.Supp.3d 826, 848–49 (D.N.M. 2019); *Steward*,

14   997 F.Supp.2d at 152. "Courts have identified examples of conduct giving rise to a § 2

15   claim for refusing to deal, including the termination of a voluntary (and thus presumably

16   profitable) course of dealing, electing to forego short-term profits for the sake of

17   eliminating competition, and the refusal to deal with the plaintiff even if compensated at

18   prevailing rates for products that the defendant already sells to others." *Steward*, 997

19   F.Supp.2d at 152; *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132–

20   34 (9th Cir. 2004); *Safeway Inc. v. Abbot Laboratories*, 761 F.Supp.2d 874, 894 (N.D. Cal.

21   2011).

22            Plaintiffs' refusal-to-deal theory does not fit these examples. Plaintiffs terminated

23   the contract with BCBSAZ, not the other way around. Nothing about the parties'

24   unsuccessful efforts to negotiate new contact rates indicates that BCBSAZ was electing to

25   forego short-term profits with the aim of eliminating competition in the healthcare

26   insurance market. And BCBSAZ is a buyer of healthcare services, not a seller, so the

27   complaint does not plausibly suggest that BCBSAZ is refusing to sell products to Plaintiffs

28   that it already sells to others (or that BCBSAZ is refusing to buy products from Plaintiffs

1    that is already buys from others—BSBSAZ indisputably still buys Plaintiffs' services, just

2    at a price lower than what Plaintiffs believe is fair). At most, the factual allegations suggest

3    that BCBSAZ acquiesced to Plaintiffs' decision to walk away from an existing business

4    relationship because it did not want to pay higher prices for Plaintiffs' services—higher

5    prices which presumably would have eaten into BCBSAZ's profits and/or been passed on

6    to consumers in the form of higher premiums.

7         All the analysis above dovetails into the fundamental problem with Plaintiffs'

8    Sherman Act claim—although Plaintiffs plausibly allege that *they* have been harmed by

9    BCBSAZ's conduct, they have not plausibly alleged that BCBSAZ's conduct has the

10   purpose and effect of harming *competition generally*. The complaint alleges that the

11   relevant market is the market for health insurance in Arizona. (¶¶ 111–12.) Plaintiffs are

12   not health insurers and do not compete with BCBSAZ in that market. Plaintiffs are sellers

13   of healthcare services and BCBSAZ is a buyer of those services. Harm to Plaintiffs is not

14   necessarily harm to BCBSAZ's competitors in the healthcare insurance market, and the

15   complaint fails to explain how the way BCBSAZ reimburses Plaintiffs for certain of their

16   submitted claims undermines competition in the market for private healthcare insurance.

17        The closest the complaint gets to alleging an injury of this type is by stringing

18   together a series of speculative contingencies. Plaintiffs posit that if BCBSAZ continues to

19   utilize IPCs to underpay claims submitted by Plaintiffs for services performed by certain

20   of their physician employees, then Plaintiffs might someday "be forced to terminate

21   physician employment contracts in order to maintain its OON status and be reimbursed as

22   such by BCBSAZ." (Doc. 1 ¶ 95.) Should this happen, and if BCBSAZ engages in similar

23   behavior with other medical provider groups, Plaintiffs hypothesize that over time, it might

24   become harder for medical providers to recruit and retain talented physicians, which over

25   time might harm healthcare consumers by reducing the overall quantity and quality of care

26   available. (¶¶ 118, 120.) "This potential for harm, however, is too speculative to satisfy the

27   pleading-stage inquiry for antitrust standing." *Anesthesia Associates*, 2021 WL 4169711,

28   at *12.

1    For these reasons, the Court concludes that Plaintiffs have not pled a plausible

2  Sherman Act claim. Plaintiffs have pled that they have been harmed by BCBSAZ's

3  reimbursement practices, and they claim those reimbursement practices are improper. But

4  to whatever extent those reimbursement practices might present a problem, it is not an

5  *antitrust* problem. Plaintiffs' Sherman Act claim is dismissed.

6    **B. Leave to Amend**

7    In the final sentence of their response brief, Plaintiffs request leave to amend their

8  complaint in the event the Court grants BCBSAZ's motion to dismiss. (Doc. 22 at 19.) This

9  request is denied because it does not comply with this Court's October 13, 2023, order

10 regarding motions to dismiss (Doc. 9) or with Local Rule of Civil Procedure 15.1.

11 Paragraph 2 of the Court's order states:

12       If the parties are unable to agree the pleading is curable in any
         part and a motion to dismiss or for judgment on the pleadings
13       is filed, and if in response to that motion the non-moving party
         asks the Court for leave to amend, the non-moving party must
14       at that time submit a proposed amended pleading that complies
         with Local Rule of Civil Procedure 15.1(a) and contains all
15       further allegations the non-moving party could make. In the
         event the motion to dismiss or for judgment on the pleadings is
16       granted in any part, no leave to amend the complaint will be
         granted beyond what is offered by the non-moving party in the
17       proposed amended complaint.

18 (Doc. 9.) And LRCiv 15.1(a) states, in relevant part:

19       A party who moves for leave to amend a pleading must attach
         a copy of the proposed amended pleading as an exhibit to the
20       motion, which must indicate in what respect it differs from the
         pleading which it amends, by bracketing or striking through the
21       text to be deleted and underlining the text to be added. The
         proposed amended pleading must not incorporate by reference
22       any part of the preceding pleading, including exhibits.

23
   Plaintiffs have ignored these rules by not attaching with their response brief (and its
24
   embedded, single-sentence motion for leave to amend) a copy of the proposed amended
25
   pleading.
26
      Worse still, Plaintiffs' response brief does not explain what—if any—amendments
27
   they would make. "The fact that Plaintiff[s'] opposition brief provides no explanation about
28
   how [they] intend[] to amend [their] complaint is sufficient reason for the Court to deny

1    leave to amend." *Long Island*, 2023 WL 8096909, at *8. Indeed, the Court doubts Plaintiffs

2    can allege facts sufficient to resurrect their Sherman Act claim. The parties met and

3    conferred on these issues prior to BCBSAZ filing its motion to dismiss, and that conferral

4    process yielded no amendments to the complaint. If Plaintiffs could plead additional facts

5    plausibly demonstrating the existence of a horizontal price-fixing conspiracy, or predatory-

6    bidding, or that BCBSAZ's reimbursement practices have as their purpose and effect the

7    elimination or diminution of competition *in the Arizona market for private healthcare*

8    *insurance*, surely the easier route would have been to amend the complaint before and not

9    after motion practice.

10   Nonetheless, if Plaintiffs believe they can allege additional facts to cure these

11   deficiencies, they may file by no later than October 15, 2024, a motion for leave to amend

12   that complies in all respects with LRCiv 15.1(a).

13   **C. The Court is inclined to decline supplemental jurisdiction over the state law**

14   **claims is the absence of a federal cause of action.**

15   With the dismissal of the Sherman Act claim, all that remains are state law claims

16   against non-diverse parties. Under such circumstances, the Court has discretion to decline

17   supplemental jurisdiction over the state law claims and dismiss them without prejudice.

18   *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726

19   (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be

20   dismissed as well."); *Gini v. Las Vegas Metropolitan Police Dep't*, 40 F.3d 1041, 1046

21   (9th Cir. 1994) (same). The Court is inclined to do so here but will first afford the parties

22   an opportunity to be heard on the issue. *See Ho v. Russi*, 45 F.4th 1083, 1087 (9th Cir.

23   2022). Accordingly, the parties are hereby notified that the Court intends to decline

24   supplemental jurisdiction over Plaintiffs' state law claims and dismiss those claims without

25   prejudice on October 16, 2024 unless, before then, the Court receives either a motion from

26   Plaintiffs seeking leave to amend the complaint to resurrect the now-dismissed Sherman

27   Act claim, or the parties otherwise show cause in writing why the Court should retain

28   jurisdiction over the state law claims.

1

**IT IS ORDERED** as follows:

2    1.  BCBSAZ's motion to dismiss (Doc. 21) is **GRANTED IN PART**. Plaintiffs'

3        Sherman Act claim is dismissed.

4    2.  By no later than **October 15, 2024**, Plaintiffs may file a motion for leave to

5        amend that complies with LRCiv 15.1(a) if they believe they can cure the defects

6        identified in this order.

7    3.  The Court will dismiss Plaintiffs' state law claims without prejudice on **October**

8        **16, 2024**, unless, before then, the Court receives either a motion from Plaintiffs

9        seeking leave to amend their complaint to reassert a Sherman Act claim, or the

10       parties otherwise show cause in writing why the Court should retain jurisdiction

11       over the state law claims.

12   Dated this 30th day of September, 2024.

13

14

15

16

Douglas L. Rayes
17   Senior United States District Judge

18

19

20

21

22

23

24

25

26

27

28